UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| JACK WARD, | ) | |
|---|---|---|
| *Plaintiff*, | ) | Case No. 3:24-cv-119 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| KATOM RESTAURANT SUPPLY, INC., | ) | Magistrate Judge McCook |
| | ) | |
| *Defendant*. | ) | |

| VAN KINSEY-BENT, | ) | |
|---|---|---|
| *Plaintiff*, | ) | Case No. 3:24-cv-237 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| KATOM RESTAURANT SUPPLY, INC., | ) | Magistrate Judge McCook |
| | ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant KaTom Restaurant Supply, Inc.'s Motion for Summary Judgment [Doc. 33][1] asking the Court to award it summary judgment as to all of Plaintiff Jack Ward's claims. For the following reasons, the Motion [Doc. 33] is **GRANTED IN PART** and **DENIED IN PART**.

I.   BACKGROUND

This is a sex discrimination, retaliation, and hostile work environment case. Plaintiff Jack Ward applied for a designer position at Defendant KaTom Restaurant Supply, Inc. in late 2022 or early 2023. [*See* Doc. 34-2 at 9–10; Doc. 40-1 at 8–9]. On January 5, 2023, KaTom offered Ward

---

[1] Unless otherwise noted, record citations refer to the record in the lead case, *Ward v. KaTom Restaurant Supply, Inc.*, 3:24-cv-119.

the designer position which Ward accepted the next day. [Doc. 34-2 at 14; Doc. 34-11]. At the time Ward applied to and accepted a position at KaTom, he identified publicly and professionally as a woman; he used his then legal name of "Bethany Ward" and she/her pronouns. [Doc. 34-2 at 15–16]. Privately, however, Ward was using they/them pronouns and going by "Char" with close friends. [*Id.* at 16]. Ward had originally intended to go by Bethany at KaTom, but he changed his mind sometime between January 5, 2023, and January 15, 2023, after deciding to medically transition from female to male. [*See id.* at 17]. The same day Ward made this decision, he called KaTom's Human Resources Lead, Travis Clemmons, to inform him that he would be going by Char, that he was transitioning from female to male, and that he would be using he/him pronouns. [*See id.* at 18, 40]. Clemmons told Ward he would be accommodated. [*Id.* at 19, 41]. KaTom's internal computer and messaging systems were updated to identify Ward as "Char" at Ward's request, [*id.* at 60–61], and Ward's supervisors, along with members of KaTom's senior management, were notified of his transition, [Doc. 40-4 at ¶ 8].

Ward's first day of work was January 23, 2023. [*See id.*; Doc. 40-1 at 41]. He began the day by attending an onboarding session with several other new hires. [Doc. 34-2 at 20]. During this session, Clemmons inadvertently referred to Ward as "Bethany" before catching himself and apologizing. [*Id.* at 20–22]. This upset Ward, but he did not attribute any malice towards Clemmons, instead "figur[ing] it was just a simple mistake" and "that [Clemmons] was probably just reading from a piece of paper." [*Id.* at 20–23]. Clemmons also mistakenly referred to Ward as "she" several times on Ward's first day, but Ward "figured it was just some sort of adjustment." [*Id.* at 24–25]. Ward did not attribute any malice to this misgendering, and Clemmons did not

2

Case 3:24-cv-00119-CEA-JEM    Document 49    Filed 01/23/26    Page 2 of 20    PageID #: 1212

misgender Ward after these handful of times on Ward's first day.² [*Id.* at 86].

As Ward began settling into his new job, one of his coworkers respectfully asked him what pronouns he used, stating she had been informed that he used they/them pronouns. [*Id.* at 38]. In response, Ward clarified that he used he/him pronouns. [*Id.*]. Ward believes that following this conversation, the coworker passed his preferred pronouns up the chain of command to Charley Bible, then KaTom's Vice President of Business Development. [*See id.* at 38; Doc. 34-6 at 15].

Shortly thereafter on January 26, 2023, Ward was unexpectedly called into a meeting with Bible and Clemmons. [*See* Doc. 34-2 at 42, 70–71; Doc. 34-6 at 15]. Ward's impression was that this meeting was called in relation to him clarifying his pronouns with a coworker. [Doc. 34-2 at 42–43]. After the meeting began, Bible told Ward that he did not want to discuss Ward's gender identity or the "drama," using air quotes, surrounding it. [*Id.* at 44–45]. Bible further stated that he would not refer to Ward by any pronouns, instead referring to him only as "Char." [*Id.* at 45]. Bible also stated that the topic made him uncomfortable and that it was off limits going forward. [*Id.*]. Clemmons agreed that the topic made him uncomfortable as he was not familiar with all its nuances. [Doc. 40-1 at 33]. As the meeting progressed, Bible further stated that he was interested in Ward's work product, not his gender. [Doc. 34-2 at 65]. Ward generally found Bible's remarks to be unacceptable. [*Id.* at 47–48]. Ward, however, did not express these feelings during the meeting. [*See id.*].

After the discussion of Ward's pronouns, focus next shifted to his name. [Doc. 40-1 at 45]. Bible brought up that Ward originally applied as Bethany but was now going by Char. [*Id.* at 43–

---

² Besides Clemmons, only one other KaTom employee, Michael Holbert, misgendered Ward during Ward's employment. [Doc. 34-2 at 62–63]. This, however, only occurred "once or twice" accidentally, and Holbert immediately took ownership of his mistake. [*Id.*]. Ward was satisfied with this response. [*See id.*].

44]. Ward felt that by raising this subject, Bible was calling his character into question and accusing him of being deceitful or otherwise untrustworthy. [*Id.* at 43–44]. Ward tried to explain that the name change was part of his gender transition but felt that Bible was not satisfied with this response. [*See id.* at 43–45].

Having discussed Ward's pronouns and name, the meeting next shifted to its final topic, restrooms. [*Id.* at 45]. KaTom did not have an official policy regarding who could use specific restrooms. [Doc. 40-3 at 22]. Bible, however, told Ward that he was only permitted to use the women's or gender-neutral restrooms, not the men's. [Doc. 40-1 at 32]. Ward preferred to use the gender-neutral restrooms at the time but felt it was not right for Bible to prevent him from using the men's restrooms, particularly since he would have rather gone to a men's restroom rather than a women's restroom if the gender-neutral restrooms were full. [*Id.* at 36, 57–58]. Despite these misgivings, Ward did not challenge the new restroom policy at the meeting. [*See id.* at 35].

After the meeting concluded, Ward contacted another KaTom employee, his then romantic partner Van Kinsey-Bent, to request that they meet to discuss what Ward had just experienced.[3] [*See* Doc. 34-2 at 13, 66]. They met at an outside area where they would sometimes eat lunch, and Ward began expressing how the meeting with Bible and Clemmons had upset him. [*Id.* at 66–67]. As Ward and Kinsey-Bent were talking, Ward's supervisor, Mike Rudd, found them, informed them that they were in an unauthorized area, and told them to return to work. [*Id.* at 66–68; Doc. 40-7 at 6–7].

The following day, Ward emailed Clemmons to confirm his understanding of the restroom

---

[3] Kinsey-Bent has filed his own one-count lawsuit against KaTom which is also pending before the undersigned. [3:24-cv-237, Doc. 1]. Given the relationship between Ward's and Kinsey-Bent's cases, the Court consolidated them for pretrial purposes. [Doc. 27]. KaTom has moved for summary judgment regarding Kinsey-Bent's sole claim. [3:24-cv-237, Doc. 30]. That motion is addressed by a separate memorandum opinion and order filed contemporaneously herewith.

policy. [Doc. 40-8; Doc. 34-2 at 51–52]. Specifically, Ward wrote: "Just wanted to reach out and double check with you about something from our conversation yesterday. Just so I'm sure, I only have access to the gender-neutral bathrooms, right? I was just wanting to verify and make sure I understood correctly." [Doc. 40-8]. In response, Clemmons messaged Ward to come to his office. [Doc. 34-2 at 52]. After arriving at Clemmons's office, Ward expressed how the prior day's meeting made him feel awful and that it was hard for him to sit there and listen to everything that was said. [*Id.* at 54]. Ward, however, did not express that he felt either harassed or discriminated against. [*Id.* at 54–55]. Clemmons responded by apologizing, telling Ward that Bible sometimes put his foot in his mouth and to not take it personally. [*Id.* at 52, 54]. Regarding Ward's email about the restroom question, Clemmons said he would look into the matter more and follow up later. [*Id.* at 53]. This did not occur before Ward was terminated. [*See id.* at 53–54].

After the conclusion of this second meeting, Ward went about his work as normal. In the days that followed, however, Rudd (Ward's supervisor) began to suspect that Ward might be misusing his Microsoft Teams messaging account after receiving reports that Ward was on Teams "an exuberant amount" and observing that Ward would minimize his Teams window when Rudd walked by his workstation. [*See* Doc. 34-4 at 8–9]. Based on these suspicions, Rudd requested that Ward's Teams data be pulled for review. [*Id.* at 10; *see also* Doc. 40-7 at 15]. As Rudd reviewed this data, he discovered that Ward had exchanged "hundreds and hundreds" of Teams messages during his short tenure at KaTom, many of which were social in nature rather than work related. [*See* Doc. 34-4 at 12]. After discovering these messages, the decision was made to terminate Ward's employment. [*See* Doc. 40-3 at 15–16].

There is a dispute as to who decided to terminate Ward. Clemmons testified that Rudd made the termination decision. [*Id.* at 16]. Rudd, however, denies this. [Doc. 40-7 at 19].

Additionally, KaTom stated in its responses to Ward's interrogatories that KaTom's Chief Executive Officer made the termination decision after Rudd, Clemmons, Bible, and James Rogers (KaTom's Chief Information Officer) recommended that Ward be terminated for his misuse of Teams. [Doc. 40-4 at ¶ 4]. Regardless of who actually made the termination decision, it is undisputed that Clemmons notified Ward he was terminated on February 16, 2023. [Doc. 34-2 at 72–73]. Clemmons told Ward that he was being terminated for his misuse of Teams and related insubordination. [*Id.* at 73–74].

This lawsuit followed. Through it, Ward alleges that KaTom unlawfully discriminated against him based on his transgender identity (a form of sex discrimination), retaliated against him for opposing unlawful activity, and subjected him to a hostile work environment, all in violation of Title VII of the Civil Rights Act of 1964. [*See generally* Doc. 1]. KaTom has moved for summary judgment as to all these claims, arguing that the undisputed evidence requires the entry of judgment in its favor. [Doc. 33]. Ward has responded in opposition to KaTom's Motion, [Doc. 40], and KaTom has replied to Ward's response, [Doc. 41]. Accordingly, the Motion is ripe for review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

6

Case 3:24-cv-00119-CEA-JEM    Document 49    Filed 01/23/26    Page 6 of 20    PageID #: 1216

fact." FED. R. CIV. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted).

The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323

## III. ANALYSIS

Ward claims that KaTom discriminated against him based on his sex (or more specifically his transgender identity), retaliated against him for opposing the restroom policy, and subjected him to a hostile work environment, all in violation of Title VII. Of these claims, only Ward's sex discrimination claim can survive summary judgment for the reasons explained below.

### A. Sex Discrimination

Ward asserts that KaTom engaged in unlawful sex discrimination under Title VII by terminating him based on his transgender identity.[4] [*See* Doc. 1 at ¶¶ 34–40; Doc. 40 at 12–17]. Viewing the evidence in the light most favorable to Ward and drawing all reasonable inferences in his favor, there is genuine factual dispute as to whether Ward was terminated because of his transgender identity. Accordingly, KaTom is not entitled to summary judgment as to Ward's sex discrimination claim.

To establish a sex discrimination claim under Title VII, a plaintiff may rely on either direct or circumstantial evidence. Direct evidence of discrimination is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Examples of direct evidence include "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group[.]" *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Erwin v. Potter*, 79 F. App'x 893, 897 (6th Cir. 2003) ("This circuit has provided the statement 'I fired

---

[4] The Supreme Court held in *Bostock v. Clayton County* that discrimination against a person based on their sexual orientation or gender identity is a form of unlawful sex discrimination under Title VII. 590 U.S. 644, 662 (2020) ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex.").

you because you are disabled' as an example of direct evidence. Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence." (internal citation omitted)). If a plaintiff provides direct evidence of intentional discrimination, then "the burden of persuasion shifts to the employer to demonstrate that it would have discharged the plaintiff even if it had not been motivated by [unlawful] discrimination." *Id.*

If a plaintiff lacks direct evidence of unlawful discrimination, he may nevertheless prevail on a discrimination claim under Title VII by relying on circumstantial evidence. Such evidence is evaluated using the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class; (2) he was qualified for the job he held or was applying to; (3) he suffered an adverse employment action; and (4) he was either replaced by a person outside his protected class or treated less favorably than similarly situated individuals outside his protected class. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). If a plaintiff establishes his *prima facie* case, then the burden shifts to the defendant employer to "articulate some legitimate, nondiscriminatory reason for the [adverse action]." *McDonnell Douglas Corp.*, 411 U.S. at 802. Once the defendant employer provides such a reason, the burden shifts back to the plaintiff "to prove that the reasons proffered by the defendant were not its true reasons, but were mere pretexts for prohibited discrimination." *Wheat*, 785 F.3d at 237. A plaintiff generally establishes pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "[T]hese are not the only ways that a plaintiff

9
Case 3:24-cv-00119-CEA-JEM   Document 49   Filed 01/23/26   Page 9 of 20   PageID #: 1219

can establish pretext[.]" *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Rather, they "are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?" *Id.* (internal quotation marks omitted). A plaintiff remains free to pursue arguments outside of the above categories, but he must always "articulate some cognizable explanation of how the evidence…put forth establishes pretext." *Id.*

In this case, Ward argues he can establish his sex discrimination claim using either direct or circumstantial evidence. [Doc. 40 at 12–17]. As Ward can defeat summary judgment regarding his sex discrimination claim based on circumstantial evidence alone, the remainder of this section will focus on the parties' arguments relating to the application of the *McDonnell Douglas* burden-shifting framework.

Starting with Ward's *prima facie* case of discrimination, KaTom does not dispute (1) that Ward is a member of a protected class (2) that he was qualified for the job he held, or (3) that he suffered an adverse employment action. [Doc. 34 at 13]. Instead, KaTom focuses its efforts on the fourth element, arguing that Ward cannot show either that he was replaced by a person outside his protected class or that he was treated less favorably than similarly situated individuals outside his protected class. [*Id.* at 13–14; Doc. 41 at 4–6]. The Court disagrees.

Ward argues KaTom replaced him with Allie LaPerch, a woman outside his protected class.[5] [Doc. 40 at 13]. KaTom does not dispute that LaPerch replaced Ward but argues that the evidence he relies on to show LaPerch replaced him—LaPerch's hiring documents—has not been

---

[5] To be outside Ward's protected class, the relevant inquiry is not whether LaPerch is a woman but rather whether she is cisgender. Here, the Court finds it reasonable to infer that LaPerch is cisgender considering that KaTom does not dispute Ward's contention that LaPerch falls outside his protected class. [*See* Doc. 41 at 4–5].

10

authenticated and therefore cannot be considered on summary judgment. [Doc. 41 at 4–5]. KaTom's argument misses the mark. "Before the 2010 amendments to Rule 56, the Sixth Circuit consistently held that unauthenticated evidence was inadmissible at the summary judgment stage." *Fid. Nat'l Title Ins. Co. v. Worldwide Prop. Hub, LLC*, No. 2:23-cv-02210-SHM-cgc, 2025 LX 373463, at *12 (W.D. Tenn. Aug. 26, 2025) (citing *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480–81 (6th Cir. 2008); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006)). The 2010 amendments, however, relaxed this prohibition. *See id.* Now, a Court may consider unauthenticated evidence on summary judgment "so long as it is capable of being authenticated at trial." *Id.*; *see also* FED. R. CIV. P. 56(c)(2) (stating that a party may object to materials cited in support of or against summary judgment on the ground that those materials *cannot* be presented in an admissible form, not on the ground that those materials *have not* been presented in an admissible form); *Roberts v. Gibbs*, 655 F. Supp. 3d 683, 692 (E.D. Tenn. 2023) (stating "a court may consider unauthenticated documents when deciding a motion for summary judgment where the objecting party simply argues that the proponent failed to authenticate the documents, as opposed to challenging the authenticity of the documents" (citation modified)). Here, LaPerch's hiring documents have not been authenticated, but nothing in the record suggests that this could not be rectified at trial. Considering this and that KaTom does not dispute LaPerch replaced Ward, the Court finds that Ward has shown he was replaced by someone outside his protected class and therefore established a *prima facie* case of sex discrimination. *See Wheat*, 785 F.3d at 237.

Thus, the burden shifts to KaTom to articulate a legitimate nondiscriminatory reason for Ward's termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. KaTom has provided such a reason: Ward's misuse of the Teams messaging platform during his brief tenure with the company. [*See* Doc. 40-3 at 14–16; Doc. 40-4 at ¶ 4]. Accordingly, the burden shifts back to Ward to show

that this proffered reason is nothing more than a mere pretext for discrimination. *See Wheat*, 785 F.3d at 237; *Weigel v. Baptist Hosp.*, 302 F.3d 367, 377–78 (6th Cir. 2002) (noting that the burden on the employer at the second step of the *McDonnell Douglas* framework is merely one of production, not persuasion).

As the Court has already noted, a plaintiff generally establishes pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd*, 766 F.3d at 590. Ward attempts to show pretext using all three methods. [Doc. 40 at 14–17]. Considering, however, that there is a genuine dispute as to whether KaTom's stated reason for Ward's termination (i.e., his misuse of the Teams messaging platform) actually motivated its decision to terminate him, the Court's analysis focuses on this method of establishing pretext.

To show that an employer's proffered reason for termination did not actually motivate its decision to terminate, a plaintiff first "'admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal.'" *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original), *overruled on other grounds by Gross v. FBLFin. Servs., Inc.*, 557 U.S. 167, 180 (2009). Then, he "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Id.* (emphasis in original). Put another way, the plaintiff attacks the employer's proffered explanation by arguing "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

Here, the evidence shows that Ward was unexpectedly called into a meeting with Bible and

12

Clemmons during which Bible stated, among other things, that that he did not want to discuss Ward's gender identity or the drama surrounding it, that he would be avoiding pronouns by referring to Ward only as "Char," and that the topic made him uncomfortable and was not to be discussed further. [Doc. 34-2 at 44–45]. The evidence further shows that after this meeting, Clemmons (i.e., KaTom's top human resources employee) was troubled enough by Bible's comments to personally apologize to Ward for them. [*Id.* at 52–54]. Viewing this evidence in the light most favorable to Ward and drawing all reasonable inferences in his favor, a reasonable factfinder could conclude that Bible harbored discriminatory animus towards transgender individuals. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (noting that factors like context, inflection, and tone of voice—among others——can turn an individual's comments into evidence of discriminatory animus). If Bible played no role in Ward's termination, then this animus would not necessarily preclude KaTom from obtaining summary judgment. *See Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009). But as it remains disputed whether and to what extent Bible participated in the decision to terminate Ward, [*contrast* Doc. 40-3 at 15–16, *with* Doc. 40-4 at ¶ 4], summary judgment is inappropriate. *See Anderson*, 477 U.S. at 248 (stating that summary judgment will not lie where there is a genuine dispute as to a material fact). Accordingly, KaTom is not entitled to summary judgment as to Ward's sex discrimination claim.

### B. Retaliation

Ward claims that KaTom terminated him in retaliation for opposing the restroom policy implemented by Bible. [*See* Doc. 1 at ¶¶ 41–49; Doc. 40 at 17–19]. As the undisputed evidence shows that Ward did not oppose this policy, KaTom is entitled to summary judgment as to this claim.

To prevail on a retaliation claim under Title VII based on circumstantial evidence, a

plaintiff must first establish a *prima facie* case of retaliation by showing that (1) he engaged in protected activity; (2) the defendant knew he had engaged in protected activity; (3) he suffered an adverse employment action; and (4) there is a causal connection between his protected conduct and the adverse employment action.[6] *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). If a plaintiff establishes a prima facie case of retaliation, then, just as with discrimination claims, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017). Once a defendant provides such a reason, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.*

Here, KaTom argues that Ward fails at the first step, that he cannot establish a *prima facie* case of retaliation because he never engaged in protected activity. [Doc. 34 at 17–19]. The Court agrees. "For a plaintiff to demonstrate a qualifying 'protected activity,' he must show that he took an 'overt stand against suspected illegal discriminatory action.'" *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 489 (6th Cir. 2020) (quoting *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012)). Ward argues he took such a stand when he emailed Clemmons about "the newly established bathroom precedent set by Mr. Bible." [Doc. 40 at 18]. Ward, however, ignores the fact that nothing in his email can be reasonably construed as opposing the restroom policy. The email does not state that the policy is discriminatory, nor does it even claim that Ward disagrees with the restrictions it imposed. [*See* Doc. 40-8]. Instead, it merely states that Ward "just want[ed] to verify and make sure [he] understood correctly." [*Id.*]. This seeking of clarification, without more, is insufficient to show that Ward "took an overt stand against suspected illegal

---

[6] Ward does not assert that he has direct evidence of retaliation, instead focusing his arguments solely on the burden-shifting framework applicable to retaliation claims based on circumstantial evidence. [*See* Doc. 40 at 17–19].

discriminatory action." *See Khalaf*, 973 F.3d at 489 (internal quotation marks omitted). Accordingly, Ward cannot establish a *prima facie* case of retaliation, and KaTom is therefore entitled to summary judgment as to Ward's retaliation claim.

### C. Hostile Work Environment

Ward claims that KaTom subjected him to a hostile work environment based on his transgender identity. [*See* Doc. 1 at ¶¶ 50–56; Doc. 40 at 19–25]. Because no reasonable factfinder could conclude that the harassment Ward claims he was subjected to was sufficiently severe or pervasive to establish a hostile work environment, KaTom is entitled to summary judgment as to this claim.

To prevail on a sex-based hostile work environment claim under Title VII, a plaintiff must establish that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on sex (or more specifically here, gender identity); (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) employer liability. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021); *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462–63 (6th Cir. 2000). KaTom does not dispute the first or third of these elements but argues that Ward cannot establish the remaining three. [Doc. 34 at 20–24]. It, however, is unnecessary for the Court to analyze each of these three remaining elements because, at the very least, Ward has failed to show that he was subjected to harassment that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Accordingly, Ward cannot establish an essential element of his hostile work environment claim.

Whether harassment is sufficiently "severe or pervasive" to support a hostile work environment claim turns on a two-pronged inquiry. *Bowman*, 220 F.3d at 463. "This standard sets

a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect." *See Khalaf*, 973 F.3d at 485. The objective prong requires that "the conduct…be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive" while the subjective prong requires that the plaintiff "subjectively regard that environment as abusive." *Bowman*, 220 F.3d at 463. The objective prong is evaluated considering the totality of the circumstances. *Id.* ("The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility."). In considering these circumstances, courts are guided by multiple factors "includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Isolated incidents, unless extremely serious, fail to establish a hostile work environment. *Bowman*, 220 F.3d at 463.

Here, Ward bases his hostile work environment claim on (i) Clemmons notifying KaTom's senior management about his transition, (ii) the comments made during the January 26th meeting, and (iii) the policy preventing him from using the men's restroom. [*See* Doc. 40 at 20–23]. Based on this evidence, no reasonable factfinder could conclude that Ward was subjected to objectively severe or pervasive harassment.

As an initial matter, Clemmons's notification to senior management that Ward was transitioning cannot even be considered evidence of harassment because Ward has not directed the Court to any evidence showing that he was aware Clemmons made this notification. "[A] plaintiff does not need to be the target of, or a witness to harassment in order for [the Court] to consider that harassment in the totality of the circumstances; but he does need to know about it." *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012). Here, nothing suggests Ward knew

Clemmons notified senior management about his transition, so that notification cannot be considered when evaluating whether Ward was subjected to a hostile work environment. *Id.*

Turning next to the restroom policy, it is not clear whether this can be considered a form of harassment under Title VII. When the Supreme Court held that discrimination based on gender identity is a form of sex discrimination under Title VII, it expressly declined to address whether this holding applied to, among other things, restroom policies. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020) ("[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind."). In the years since *Bostock*, some courts have found that denying a plaintiff access to the restroom that aligns with his or her gender identity can support a hostile work environment claim. *See, e.g.*, *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129–30 (E.D. Pa. 2020) (finding a transgender woman had plausibly alleged a hostile work environment claim where she alleged, among other things, that she was denied access to the women's bathroom). Other courts, however, have reached the opposite conclusion. *See, e.g.*, *Texas v. EEOC*, 785 F. Supp. 3d 170, 191–92 (N.D. Tex. 2025) (vacating EEOC enforcement guidance because it, among other things, "contravenes Title VII by defining discriminatory harassment to include failure to accommodate a transgender employee's bathroom, pronoun, and dress preferences"). It, however, is not necessary for the Court decide whether preventing a transgender employee from using the restroom that aligns with his or her gender identity is a form of harassment under Title VII because even assuming that it is, Ward still cannot show that he was subjected to objectively severe or pervasive harassment.

Bible told Ward that he was permitted to use either the gender-neutral or the women's restrooms. [Doc. 40-1 at 32]. At the time, Ward was already using the gender-neutral restrooms and preferred them. [*Id.* at 36]. Ward stated that had the gender-neutral restrooms been full, his

17
Case 3:24-cv-00119-CEA-JEM    Document 49    Filed 01/23/26    Page 17 of 20
PageID #: 1227

next preference would have been the men's restrooms as opposed to the women's. [*Id.* at 57–58]. Ward, however, has not directed the Court to any evidence suggesting that he was ever in a situation where his preferred gender-neutral restrooms were unavailable or that the restroom policy otherwise affected his restroom use. Thus, to the extent the restroom policy may be considered a form of harassment, the weight it carries in showing Ward was subjected to objectively severe or pervasive harassment is greatly diminished by its lack of practical effects.

The comments made at the January 26th meeting similarly fail to tip the scales in Ward's favor. At this meeting, Bible stated that he was interested in Ward's work product, not his gender, that he did not want to discuss Ward's gender identity or the drama surrounding it, that he would refer to Ward only as "Char" and not by any pronouns, and that the topic of gender identity made him uncomfortable and was not to be discussed further. [Doc. 34-2 at 44–45, 65]. He also noted that Ward had originally gone by Bethany but was now going by Char, a line of conversation Ward felt called his character into question. [Doc. 40-1 at 43–45]. As for Clemmons, he merely agreed that the topic of gender identity made him uncomfortable, stating that he was unfamiliar with all its nuances. [Doc. 40-1 at 33]. These comments may have been offensive,[7] but they were contained to a single private meeting, did not physically threaten Ward, and did not overtly disparage his gender identity. Consequently, these comments, like the restroom policy, carry little weight in showing Ward was subjected to objectively severe or pervasive harassment.

Viewing the January 26th comments and the restroom policy in the totality of the circumstances as the Court must, *see Bowman*, 220 F.3d at 463, it is apparent no reasonable factfinder could conclude that Ward has cleared the "high bar" of showing he was subjected to

---

[7] Indeed, the Court has already found that a reasonable factfinder could conclude that several of Bible's comments suggest he harbors discriminatory animus against transgender individuals. *See supra* Section III.A.

objectively severe or pervasive harassment. To illustrate this point, consider the number of Sixth Circuit cases where plaintiffs facing more frequent and harsh forms of harassment than those experienced by Ward were nevertheless told that the harassment they faced was not objectively severe or pervasive. *See, e.g.*, *id.* at 458–59,464 (finding the plaintiff was not subjected to objectively severe or pervasive harassment where his superior thrice engaged in physically invasive conduct—including one time where she grabbed the plaintiff's buttocks and said she "controlled [his] ass and she would do whatever she wanted with it"—and made other unwanted sexual advances); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (finding the plaintiff was not subjected to objectively severe or pervasive harassment where her superior made vulgar jokes, commented on her clothing, and made sexual advances related to her job evaluation); *Clark v. UPS*, 400 F.3d 341, 351 (6th Cir. 2005) (finding the plaintiff was not subjected to objectively severe or pervasive harassment where another employee made vulgar jokes, twice placed a vibrating pager against her upper thigh and asked if it "felt good," and pulled on her overalls in an apparent attempt to see her underwear). If these plaintiffs could not establish objectively severe or pervasive harassment, then neither can Ward. Accordingly, KaTom is entitled to summary judgment as to Ward's hostile work environment claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant KaTom Restaurant Supply, Inc.'s Motion for Summary Judgment [Doc. 33] is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff Jack Ward's retaliation and hostile work environment claims under Title VII are **DISMISSED WITH PREJUDICE**. Ward's remaining claim, sex discrimination under Title VII relating to his termination, shall proceed to trial.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE**